# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 1 C 905 | **DATE** | 8/31/2001 |
| **CASE TITLE** | Charter Nat'l. Bank and Trust vs. Charter One Financial, Inc. et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter MEMORANDUM, OPINION AND ORDER: The motion for a preliminary injunction brought by Charter National Bank & Trust is denied because plaintiff cannot show a reasonable likelihood of success on the merits. Defendant's motion to disqualify the testimony of Professor Douglas Lichtman is granted. It is so ordered.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | SEP 0 4 2001 |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | SEP 0 4 2001 |
| TSA | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

FD-7 FILED FOR DOCKETING
01 AUG 35 AM 8:06

Document Number: 38

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHARTER NATIONAL BANK and TRUST, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 01 C 0905<br>)<br>) Wayne R. Andersen |
| CHARTER ONE FINANCIAL, INC., CHARTER ONE BANK, FSB and ST. PAUL FEDERAL BANK FOR SAVINGS, | ) District Court Judge<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the Motion for a Preliminary Injunction brought by plaintiff Charter National Bank & Trust. After consideration of our original order granting in part a temporary restraining order, several days of testimony, hundreds of exhibits and hundreds of pages of legal briefs, we deny plaintiff's motion.

## BACKGROUND

On May 15, 2001, we entered a Memorandum, Opinion and Order in which we granted in part and denied in part plaintiff's motion for a temporary restraining order. This case involves a trademark dispute. Plaintiff, Charter National Bank & Trust, currently operates three branches in Hanover Park, Hoffman Estates and Schaumburg, Illinois. Defendant, Charter One, is a large interstate bank, chartered federally, which operates approximately 70 branches in the Chicago area.

Plaintiff argues that is has acquired common law rights in the mark "charter." Therefore, we attempted to determine the date it began using the mark. Although we requested a specific

time line, plaintiff was unable to demonstrate the exact date upon which it began using the name Charter Bank and Trust of Illinois at the Hanover Park facility. The parties agree that plaintiff began using that mark sometime in 1986. Since 1987, it has displayed a large sign in front of the Hanover Park branch with the words "Charter Bank". In 1993, it acquired the Hoffman Estates and Schaumburg branches. Since 1993, those branches have displayed large signs with the words "Charter Bank". Although plaintiff never registered it's mark, it claims to have acquired a common law right in the term "Charter Bank" because it has continuously operated banking establishments using that mark since 1987.

However, plaintiff has changed its legal name several times. It originally operated under the name Hanover Park State Bank. In 1986, it began using the mark "Charter Bank and Trust of Illinois." In 1993, Charter Bank and Trust of Illinois was acquired by the First National Bank of Hoffman Estates. The combined entity began to use the mark "Charter Bank and Trust, N.A." In 1996, plaintiff began using the mark "Charter National Bank & Trust." During the preliminary injunction hearing we heard testimony that customers have referred to the entity as "Charter Bank" from 1987 to the present.

Defendant, Charter One, operates on a national scale. It filed a federal registration for the mark "Charter One" before the United States Patent and Trademark Office on October 10, 1990. It has continuously operated under that trade name since its registration. Charter One made its first foray into the Chicago market by acquiring St. Paul Federal Bank for Savings in 1999. Between the acquisition and January 2001, it operated St. Paul's fifty-eight Chicago locations under the trade name "St. Paul." In January of 2001, defendant announced that it was changing its name in the Chicago market from St. Paul to Charter One Bank.

On February 6, 2001, counsel for plaintiff Charter National Bank and Trust sent a letter to Charter One demanding that it cease using the mark "charter" because his client asserted common law rights as the senior user in Chicago area. Because Charter One continued use its name, plaintiff filed the instant lawsuit on February 8, 2001, seeking injunctive relief. While this court was analyzing the motion for a temporary restraining order, defendant agreed to refrain from displaying the mark "Charter One" on the outside of branches in a geographic area surrounding Charter National Bank and Trust's three branches. On May 15, 2001, we granted in part and denied in part plaintiff's motion for a temporary restraining order. We held that plaintiff had shown a reasonable likelihood of success on the merits based on its submission of evidence of brochures, advertisements, signs and evidence of actual confusion. Therefore, we entered a TRO which prohibited Charter One from "operating any type of bank facility using the word 'charter' on any outdoor signs within the geographic area between Lake Cook Road, on the north, I290, I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west."

## DISCUSSION

In order to determine whether to grant a preliminary injunction, we must find that the moving party has demonstrated: (1) a reasonable likelihood of success on the merits, and (2) no adequate remedy at law. Mil-Mar Shoe Co., Inc. v. Shonac Corp., 75 F.3d 1153, 1156 (7th Cir. 1996). If the moving party successfully establishes those criteria, then we consider: (3) the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied, and (4) the effect our action will have on the public interest. Id. "If it is plain that the party seeking the preliminary

injunction has no case on the merits, the injunction should be refused regardless of the balance of the harms." Green River Bottling Co. v. Green River Corp., 997 F.2d 359, 361 (7th Cir. 1993).

Trademarks are generally classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary and (5) fanciful. Two Pesos Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992). Defendant contends that "charter", as applied to banking services, is generic. In order to proceed to the next step in our analysis, plaintiff must convince this court that it has a reasonable likelihood of showing that "charter" is at least descriptive because generic marks receive no trademark protection. Id. Plaintiff contends that the term "charter" is at least entitled to the protection accorded to suggestive marks. Plaintiff bears the burden of showing that its mark can be protected because it has failed to federally register its mark. Technical Publishing Co. v. Lebhar-Friedman, Inc., 729 F.2d 1136, 1139 (7th Cir. 1984). After extensive analysis, we have determined that use of the term "charter" to denote banking services is either generic or descriptive use and, therefore, we will examine both classifications.

A generic term is one that is commonly used to name or designate a kind of good. Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934 (7th Cir. 1986). A generic term specifies the type of thing in common parlance. Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 905 (7th Cir. 1983). A descriptive mark describes the ingredients, qualities or characteristics of the good or service. Id. The difference between "generic" and "descriptive" terms is the degree of distinctiveness and their relative ability to serve as a source-identifier of particular goods and services. Mil-Mar, 75 F.2d at 1158.

However, plaintiff contends that its mark is at least suggestive. The Seventh Circuit has applied a test to determine whether a mark is descriptive or suggestive. "If the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." A. Seidel, S. Dalroff, and E. Gonda, Trademark Law and Practice § 4.06, at 77 (1963)(quoted in The Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 673-74 (7th Cir. 1982); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 952 (7th Cir. 1992). The question we must consider is how much imagination, if any, is necessary to connect charter with banking services.

The parties have submitted a myriad of definitions beginning with plaintiff's counsel's recitation of a portion of the Magna Carta in his closing. Webster's International defines a charter as "1: written instrument or contract (as a deed) executed in due form, 2a: an instrument in writing from the sovereign power of a state or country granting or guaranteeing rights, franchises, or privileges b: an instrument in writing creating and defining the franchises of a city, university, company, or other public or private corporation . Webster's Third New International Dictionary 378 (3rd ed. 1993). Webster's Collegiate contains the identical definition. Webster's Ninth New Collegiate Dictionary 228 (9th ed. 1990).

What we must decide is whether the term "charter" requires so much imagination to link it to a bank that the term should be protected. All parties agree that banks must be chartered by either the state or federal government. Illinois law refers to "national charter banks and banks organized in other states" as categories of banks. 205 ILCS 5/13; 20 Ill. Reg. 1939. The United States Code refers to "chartered bank" as a category of bank throughout the code. See 12 U.S.C.A. § 29, 12 C.F.R. § 263.81(d), 12 U.S.C.A. § 266, 12 U.S.C.A. § 1841, 12 U.S.C.A. §

5

2902, 12 U.S.C.A. 3106(a)(C), 12 U.S.C.A. 1817. Furthermore, defendant has conducted a variety of searches including a Lexis-Nexis search and a search of Yellow Pages over the world wide web. Through the Lexis search, defendants have unearthed a large number of articles describing "charter" banks as a type of bank. The sources on these articles run the gamut from popular news periodicals, like the Fresno Bee and the Tulsa World, to more specific business periodicals like Texas Banking. However, given the large number of popular press references to "charter" banks that defendant was able to unearth, it is clear that a portion of the public understands the descriptive quality of the term "charter."

After an examination of the on-line Yellow Pages, a search submitted by defendant of "charter" on the U.S. Trademark Electronic Search System ("TESS"), and a Dun & Bradstreet report on "charter national" submitted by defendant, it is clear to this court that "charter" is a term used frequently to describe banks and other businesses. Although we do not believe that it takes no imagination to connect charter with a bank, the fact that many banks use charter coupled with the legal necessity of obtaining a charter before operating as a bank shows that it does not require much imagination to connect the two ideas. While not as generic a term as "bank", "charter", in this context, describes the fact that the bank is licensed by the government. Because the mark "imparts information directly it is descriptive." Sands, 978 F.2d at 952. Therefore, it is clear to this Court that the plaintiff has no reasonable likelihood of establishing that "charter" is suggestive as applied to banking services.

The decision of whether "charter" is descriptive or generic is much closer. Since "charter" is commonly used by other banks, the popular press, and statute, to denote a type of bank, it is a term which designates a kind of service. Mil-Mar, 75 F.3d at 1157, Johnny Blastoff

6

v. Los Angeles Rams Football Co., 188 F.3d 427, 438 (7th Cir. 1999). We believe that the term may be generic and, therefore, unprotectable. However, we will analyze this issue assuming that "charter" is descriptive.

In order to protect a descriptive mark, the plaintiff must establish that the mark has acquired a secondary meaning. Mil-Mar, 75 F.3d at 1157. Secondary meaning refers to the manner in which a consumer identifies a business by reference to a trademark. Vaughan Mfg. Co. v. Brikam Int'l, Inc., 814 F.2d 346, 348 (7th Cir. 1987).

We must consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys. Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 728 (7th Cir. 1998). Plaintiff has presented very little in the way of evidence in any of the five above categories.

Eugene Ognibene, the president of Charter National Bank & Trust, testified that the bank advertised in the following ways: (1) sending direct mail to customers and non-customers (it would buy advertising lists to find the non-customers); (2) print advertising in the Yellow Pages, the Daily Herald and the Northwest Suburban edition of the Chicago Tribune; (3) statement stuffers to current customers; and (4) advertisements on its webpage. All these forms of advertising referred to the plaintiff as "Charter National Bank and Trust", some referred to it as "Charter National", some referred to plaintiff simply as "Charter", and only the webpage referred to plaintiff as "cn-bank". Ognibene testified that Charter National Bank and Trust typically budgets $180,000 a year for advertising and typically spends the entire sum. That sum is insufficient to convince this Court that the public at large would associate the mark "charter"

with plaintiff. Ognibene further testified that the bank consciously attempted to spread the budget out over the entire Chicago metropolitan area. It is this court's opinion that the use of such a relatively small sum to cover an area as large and heavily populated as Chicago is plainly insufficient to show that the recognition of the plaintiff exists above the general static accompanying a consumer's life in an active advertising market like Chicago.

The second factor we must consider is sales volume. Ognibene testified that Charter National Bank & Trust has about 15,000 customers. Over 150,000 individuals live in Hoffman Estates, Schaumburg and Hanover Park. Approximately 8 million individuals reside in the Chicago metropolitan area. Even if all of plaintiffs customers resided in Hoffman Estates, Schaumburg and Hanover Park and we were attempting to determine whether plaintiff had achieved a secondary meaning in those geographical areas, we would be hard pressed to do so based on its sales volume. Over 81% of Charter National Bank & Trust's deposit customers, by far the bulk of its business, live within four miles of one of the three branches. We cannot conclude that 15,000 customers is enough to show a secondary meaning has been established in the minds of Chicago banking consumers.

The third factor is the length and the manner of use. Sometime in 1986, the plaintiff began using a variation on the mark "charter." Plaintiff is currently on its third version of its official name using "charter." It started as "Charter Bank & Trust of Illinois" then moved to "Charter Bank & Trust, N.A." and, finally, is currently using "Charter National Bank & Trust." On advertisements, plaintiff uses "Charter National Bank & Trust", "Charter National", "Charter", and "cn-bank." The use of multiple identifying marks lessens the likelihood that members of the public have developed an identification between plaintiff and the mark "charter."

Plaintiff has been using some form of the mark "charter" for almost fifteen years and we did hear testimony that bank customers commonly refer to banks using the first or first and second word of the title, but plaintiff would have to show a longer period of consistent use in advertisements and relations with the public for this factor to weigh in it's favor.

The fourth and fifth factors are consumer testimony and consumer surveys. Plaintiff has presented no consumer testimony or survey evidence. However, plaintiff has presented evidence of actual customer confusion. Since the inception of this litigation, plaintiff has instructed its employees to keep a log of instances in which it has been confused with Charter One Bank. Those logs have been filed with the court. Examples of confusion run from individuals walking in and thinking that Charter National Bank & Trust is Charter One to other banks mistaking the two institutions. Plaintiff has documented several hundred instances of what it terms "actual confusion."

Testimony, by some of the individuals responsible for compiling the logs, has shown that in virtually all instances, the consumer or other bank knew it was searching for Charter One, but mistakenly contacted Charter National Bank & Trust. 172 of those instances of confusion occurred over the phone. 130 of the instances of confusion occurred by customers actually entering one of Charter National Bank & Trust's branches. Of that 130, 123 of the walk-ins occurred at the Hanover Park Branch. Defendant has argued that the confusion is generated by the fact that we have ordered it to cover its sign across the street from that location.

This confusion is not of the kind or scope which could convince this Court that Charter National Bank & Trust has acquired a secondary meaning. These customers are looking for Charter One, they know they are looking for Charter One, and testimony showed that several

were disappointed or even angry when they realized that plaintiff was not associated with Charter One. If anything, this evidence shows that defendant has acquired a secondary meaning in the minds of consumers and when consumers think of the mark "charter", they associate it with Charter One Bank, not plaintiff. Plaintiff cannot show that it has lost a single customer because of confusion generated by the similarity of names. We have heard testimony that all of plaintiff's customers know the bank, in fact, most customers are known by name by the receptionist. Therefore, the only confusion is generated by individuals who know they are looking for Charter One and mistakenly believe that plaintiff is somehow connected to Charter One. This type of confusion cannot be used by plaintiff to show that it has acquired a secondary meaning in the mind of consumers because, by definition, this type of confusion proves that plaintiff's existence has not been noticed by the consumers who are confused.

After a careful analysis of the factors which we must consider in order to determine whether Charter National Bank & Trust can show that it has acquired a secondary meaning, we hold that it has not shown a reasonable likelihood of success on the merits. In its final filing, Charter National Bank & Trust informed the court, for the first time since the inception of this litigation, that it intended to complete a survey. Perhaps that evidence could tip the scale, but at this point, based on the evidence before the court, plaintiff cannot show that "charter" has achieved a secondary meaning in the minds of consumers which identifies with its products and services. Therefore, even if "charter" is a descriptive and not generic mark, plaintiff does not have a reasonable likelihood of success on the merits because it cannot show that it has acquired a secondary meaning.

A final issue that arose as part of the preliminary injunction hearing is whether Douglas

Lichtman is qualified to testify as an expert under the standards established by <u>Daubert</u> and its progeny under Federal Rule of Evidence 702. <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993); <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999); <u>General Electric Co., v. Joiner</u>, 522 U.S. 136 (1997). As a trial court, we must function as a "gatekeeper" with respect to the screening of expert testimony in order to assure the reliability and relevancy of expert testimony. <u>Kumho</u>, 526 U.S. at 147. In the instant case, defendant has challenged Professor Lichtman's credentials to testify about trademark law.

Since June of 1998, Professor Lichtman has been employed as an assistant professor of law at the University of Chicago. From June of 1997 through May of 1998, he was employed as a Fellow at Yale Law School. His academic credentials are impressive. He was graduated from Yale Law School in 1997 as an Olin Fellow in Law, Economics and Public Policy and as a Coker Teaching Fellow in Constitutional Law. He attended Duke University and was graduated first in his class with a B.S.E. in Electrical Engineering and Computer Science. He has published seven works, on subjects including telecommunications law, patents and jury reform. None of the works that Professor Lichtman has published focuses on trademark law, but he is currently researching a project that has a focus in trademark law. Furthermore, the classes that he has taught while an assistant professor at the University of Chicago contain a trademark component. During the preliminary injunction hearing, Professor Lichtman testified that he considers himself an expert able to testify about trademark law, patent law, and law involving emerging technology. Professor Lichtman has never done any practical work on a trademark. He has never drafted a trademark application, defended a trademark or prosecuted a trademark.

Professor Lichtman is not currently qualified to testify as an expert on trademark law. Courts have recognized that expertise may be acquired through practical experience, academic experience or simply through observing the work of others. DePaepe v. General Motors Corp., 141 F.3d 715, 719 (7th Cir. 1998); Wetherill v. University of Chicago, 565 F.Supp. 1553, 1563-64 (N.D. Ill. 1983)(Shadur, J.). However, Professor Lichtman has no special qualification over the average lawyer in the field of trademark. He testified that he is qualified as an expert because "I am incredibly well read in the area, read all relevant law, read a lot of the relevant cases, read a lot of the commentary, try to understand what the next issues will look like, try to understand the policies that caused us to design the law the way we did, their strengths and weaknesses. The details of practicing trademark law, that is not what I do." Essentially, Professor Lichtman is asking this Court to certify him as an expert because he has done what any motivated lawyer could do, namely, study precedent. There is no special or unique perspective, other than his intelligence, which Professor Lichtman can bring to the court. It is difficult to reconcile Professor Lichtman's lack of overall experience with his claim to be an expert in so many wide-ranging areas of the law. Given that none of his published work involves trademark law and that trademark law only comprises a small subset of larger topics which he teaches, we cannot find Professor Lichtman qualified as an expert.

However, we have considered his legal arguments. In our opinion, he advanced no arguments that could not have been presented to this court as legal argument in a brief or memorandum. As our opinion makes clear above, we rejected Professor Lichtman's analysis that, using the imagination test, "charter" is a suggestive mark.

## CONCLUSION

The Motion for a Preliminary Injunction brought by Charter National Bank & Trust is denied because plaintiff cannot show a reasonable likelihood of success on the merits. Defendant's motion to disqualify the testimony of Professor Douglas Lichtman is granted.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: August 31, 2001